MOON LANDRIEU, Judge Pro Tempore.
The defendant, Transit Management of Southeast Louisiana (“Transit Management”), appeals the January 19, 2002 judgment of the Office of Worker’s Compensation (“OWC”) that held that Transit Management arbitrarily refused to authorize surgery for Patricia Sneed, the claimant/employee. The workers’ compensation court awarded Ms. Sneed penalties and attorney’s fees without awarding Ms. Sneed reimbursement of the medical expenses incurred with her second surgery. Ms. Sneed answered the appeal. We affirm in part, reverse in part, and amend.

Facts

On May 2, 1999, employee Patricia Sneed, a streetcar operator, sustained injuries when a streetcar was involved in a collision with a garbage truck on Broadway and St. Charles Avenue. After receiving conservative treatment with a family practice physician, Ms. Sneed was treated by Dr. Kenneth Vogel, a neurosurgeon. Dr. Vogel performed several tests, including a CT scan, an MRI, and a disco-gram. On October 12, 1999, Dr. Vogel recommended a microsurgical discectomy and a medial branch neurotomy.
Ms. Sneed was seen by Transit Management’s independent medical examiner, Dr. John Schumacher, and by Dr. Carlos R. Gorbitz for the OWC. Dr. 19,Schumacher and Dr. Gorbitz recommended further therapy rather than surgery. Transit Management denied Ms. Sneed’s request for surgery by Dr. Vogel.
Dr. Vogel stated in his deposition that because the neurotomy surgical procedure was denied, he then recommended a procedure, Intradiscal Electrathermal Therapy (“IDET”), as a compromise. Transit Management denied ■ authority for that procedure as well. Ms. Sneed continued to complain of pain, and in February 2000, Dr. Vogel recommended an epidural lumbar block to give her temporary relief. The procedure did not resolve Ms. Sneed’s problems. On April 10, 2000, Ms. Sneed was admitted into the hospital for the IDET surgery. The procedure was performed but did not successfully relieve all of Ms. Sneed’s pain, and on March 6, 2001, Dr. Vogel again recommended the cervical neurotomy.
Transit Management scheduled a second appointment for Ms. Sneed to see Dr. Schumacher on April 18, 2001. Ms. Sneed’s attorney canceled the appointment with Dr. Schumacher. On April 25, 2001, without obtaining approval from Transit Management, Ms. Sneed underwent the neurotomy. Transit Management stated that it did not discover that the neurotomy had been performed until Dr. Vogel’s deposition was taken on May 1, 2001.

Relevant Procedural History

On February 2, 2001, a consent judgment was presented to the OWC judge. In this judgment, the parties agreed that Transit Management would pay certain past-due medical bills within forty-five days, according to a fee schedule. On April 11, 2001, Ms. Sneed filed a motion to enforce the judgment, claiming that Transit Management had not paid all medical bills incurred prior to the neurotomy pursuant to the settlement agreement. At trial on February 6, 2002, Ms. Sneed and 13Transit Management’s adjuster testified. The deposition of Dr. Vogel and the medical records were included in the record.
The OWG judgment dated July 19, 2002, held that: (1) Transit Management paid all outstanding medical bills incurred prior to the April 25, 2001 neurotomy, and was therefore not liable for penalties and/or attorney fees for medical bills incurred prior to that surgery; (2) Transit Management was aware of Dr. Vogel’s recommen *257 dations for a neurotomy, and failed or refused to authorize it for no given reason; and (3) because Transit Management was arbitrary and capricious in both refusing to authorize and to pay for the neurotomy, Ms. Sneed was entitled to penalties in the amount of $2,000 or 12% of the cost of the neurotomy, whichever is greater; as well as an award for attorney’s fee in the amount of $6,000. The judgment was silent as to reimbursement of the medical expenses incurred in connection with the neurotomy.
Both parties filed a motion for new trial, but before the motions could be heard, the original OWC judge stepped down from her position to run for public office. Her successor denied both new trial motions.
Transit Management filed a suspensive appeal, and Ms. Sneed filed an answer, requesting an award of medicals bills connected with the neurotomy, and an increase in attorney’s fees.

Issues

Transit Management contends that the trial court erred in: (1) finding that Transit Management unreasonably refused to authorize the neurotomy; and (2) failing to find that Ms. Sneed violated La. R.S. 23:1121 by not attending the scheduled appointment with Dr. Schumacher.
|4Ms. Sneed answered the appeal, arguing that the trial court erred in failing to find that: (1) Transit Management was liable for $24,807 in medical bills for the neurotomy, despite finding Transit Management arbitrary and capricious in not paying for same; (2) Transit Management was liable for $4,340 in medical bills associated with treatment prior to the neuroto-my. Additionally, Ms. Sneed seeks additional attorney’s fees for this appeal.

Standard of Review:

Generally, factual findings in a workers’ compensation case are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551, 556. However, under certain circumstances, when there is a contradictory judgment, the appellate court performs a de novo review.
In Evans v. Lungrin, 97-0541, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735, the Louisiana Supreme Court stated:
It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence.... A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial .... Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.... When such a prejudicial error of law skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo.
See also Stephens v. Stephens, 02-0402 (La.App.1 Cir. 6/21/02), 822 So.2d 770.
In Kerrigan v. Imperial Fire and Cas. Ins. Co., 99-603, 99-604 (La.App. 3 Cir. 11/3/99), 748 So.2d 67, the Third Circuit found that the trial court’s judgment was interdicted by error because the trial court erred legally by not apportioning fault. *258 The appellate court performed an independent de novo review of the complete record in apportioning fault. The appellate court also exercised its own discretion in fixing the damage award.
In Boudreaux v. Farmer, 604 So.2d 641, 653 (La.App. 1 Cir.1992), the First Circuit found that a de novo apportionment of fault was necessary on appeal in an action involving an automobile accident. However, the appellate court noted that the trial court’s erroneous failure to assign any percentage of fault to the passing driver did not interdict the trial court’s findings of fact as to whether the other driver and the Department of Transportation and Development (“DOTD”) were at fault. Therefore, the factual findings as to those parties’ fault were reviewed for manifest error. The First Circuit also stated that:
[I]f the validity of a jury verdict or trial court judgment on quantum is interdicted by a factual or legal error, the abuse of discretion standard will not be followed, and the appellate court will not remand but will undertake an independent evaluation of the record and exercise its own discretion to fix a (de novo) quantum award, if the record is otherwise complete. Suhor v. Gusse, 388 So.2d 755 (La.1980).
604 So.2d at 653.
The First Circuit referred to the Suhor case, in which the Louisiana Supreme Court found that the trial court erred in its jury instruction which influenced the jury verdict. In Suhor, the Supreme Court noted that:
An appellate court, when it believes that errors committed at trial influenced the jury verdict, must | B-undertake an independent [de novo ] evaluation of the facts and adjudicate the controversy before it. Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976)....
388 So.2d at 756.
The Supreme Court set aside the jury verdict and remanded the case to the appellate court for an independent (de novo) evaluation of the damages.
In Charles v. Cecil Chatman Plumbing and Heating Co., 96-299 (La.App. 3 Cir. 10/23/96), 686 So.2d 43, the Third Circuit held that the jury’s failure to award general damages, after it awarded the motorist medical expenses, was an error of law, reviewed de novo. The appellate court was not constrained to the lowest amount that the trial court should have awarded.
In the present case, the workers’ compensation judgment assessed penalty fees in the amount of $2,000 or 12% of the cost of the neurotomy, whichever is greater, as well as an award for $6,000 in attorney’s fees without awarding medical expenses incurred for the neurotomy surgery itself. Because the trial court found that the employer was arbitrary and capricious but did not award an amount for the expenses for the neurotomy procedure, the judgment is interdicted by error, and the record is subject to an independent de novo appellate review of the record.

Claimant’s Request for $4,310 in Medical Expenses Prior to Neurotomy

Ms. Sneed claims that Transit Management failed to pay $4,340 medical expenses incurred prior to the neurotomy. The parties had a verbal agreement on February 14, 2001, that Transit Management would pay the disputed bills in connection with the first IDET surgery within 45 days and pursuant to the Louisiana Fee Schedule. The parties agreed that Ms. Sneed would not claim penalties and attorney’s fees with respect to the medical expenses incurred before the neurotomy was performed. At the trial on February 6, 2002, Transit |7Management provided D-4, its opposition to the claimant’s motion to enforce the consent judgment, which gave *259 details of Transit Management’s efforts to obtain the information necessary to audit and pay the bills.
La. R.S. 23:1201(2) provides for payment of penalties for the late payment of medical bills. La. R.S. 23:1201 F(2) states:
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
Transit Management provided evidence that it made efforts to timely pay the bills but was hampered by the failure of the various health care providers to timely provide the information and documentation necessary to pay the bills pursuant to the fee schedule. We conclude that the defendant paid all outstanding medical bills in a timely manner.

Claimant’s Failure to Attend Scheduled Appointment

Transit Management complains that the OWC judge erred in failing to find that Ms. Sneed violated La R.S. 23:1121 by not attending the scheduled appointment with Dr. Schumacher.
La. R.S. 23:1121 provides in pertinent part:
§ 1121. Examination of injured employee
A. An injured employee shall submit himself to an examination by a duly qualified medical practitioner provided and paid for by the employer, as soon after the accident as demanded, and from time to time thereafter as often as may be reasonably necessary and at reasonable hours and places, during the pendency of his claim for compensation or during the receipt by him of payments under this Chapter. The employer or his workers’ compensation carrier shall not require the employee to be examined by more than one duly qualified medical practitioner in any one field or specialty unless prior consent has been obtained from the employee. [Emphasis added.]
|SB. The employee shall have the right to select one treating physician in any field or specialty. The employee shall have a right to the type of summary proceeding provided for in R.S. 23:1124(B), when denied his right to an initial physician of choice. After his initial choice the employee shall obtain pri- or consent from the employer or his workers’ compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
C. If the employer or insurer has not consented to the employee’s request to select a treating physician or change physicians when such consent is required by this Section, and it is determined by a court having jurisdiction that the withholding of such consent was arbitrary and capricious, or without probable cause, the employer or the insurer shall be liable to the employee for reasonable attorney fees related to this dispute and for any medical expense so incurred by him for an aggravation of the employee’s condition resulting from the withholding of such physician’s services.
In the present case, the record reveals that on April 6, 2001, Ms. Sneed’s attorney canceled her April 18, 2001 second appointment with Dr. Schumacher. Debbie Hebert, the adjuster for Transit Management, testified that she received a letter from Ms. Sneed’s attorney explaining why the appointment was canceled. Ms. Sneed’s attorney related that after speaking with Dr. Schumacher’s assistant, it was determined that Dr. Schumacher would *260 not approve the neurotomy procedure, regardless of the examination, and it would therefore be useless to have Ms. Sneed reexamined.

Medical Expenses for Neurotomy La. R.S. 23:114-2

Transit Management maintains that because Ms. Sneed did not get prior approval for the neurotomy, the $750 statutory cap pursuant to La. R.S. 23:1142 should be applied, and that the trial court’s judgment properly reflected that limit of liability.
| ¡¡La. R.S. 23:1142 B provides:
B. Non-emergency care. (1) Except as provided herein, each health care provider may not incur more than a total of seven hundred fifty dollars in non-emergency diagnostic testing or treatment without the mutual consent of the payor and the employee as provided by regulation. Except as provided herein, that portion of the fees for non-emergency services of each health care provider in excess of seven hundred fifty dollars shall not be an enforceable obligation against the employee or the employer or the employer’s workers’ compensation insurer unless the employee and the payor have agreed upon the diagnostic testing or treatment by the health care provider.
Generally, an employee must receive prior approval from his employer before he seeks non-emergency medical attention for a work-related accident or injury. La. R.S. 23:1142 B; INA v. Hayes, 93-1648 (La.App. 3 Cir. 8/31/94), 643 So.2d 190, 195. This statute allows a health care provider to incur up to $750 in non-emergency diagnostic testing and treatment without the mutual consent of the payor for the payment of the claimant’s medical expenses resulting from a work-related injury-
An exception to La. R.S. 23:1142 is found in section E. It states:
In the event that the payor has denied that the employee’s injury is compensa-ble under this Chapter, then no approval from the payor is required prior to the provision of any diagnostic testing or treatment for that injury.
In interpreting La. R.S. 23:1142 E, it has been held that an insurance carrier’s refusal to authorize medical treatment can constitute a denial of compensability as provided in section E and, therefore, no approval from the payor may be required. Gros v. Gaudin, 2000-1015 (La.App. 5 Cir. 10/31/00), 773 So.2d 172; Barron v. First Lake Properties, Inc., 93-902 (La.App. 5 Cir. 3/29/94), 636 So.2d 970.
|inIn the present case, the parties do not dispute that Ms. Sneed’s injury was work related or that her disability resulted from the work-related injury. Transit Management, however, questioned the need for the neurotomy based on the opinion of Dr. Schumacher. Transit Management maintains that the surgical procedure is controversial and performed by only a small number of surgeons. Transit Management argues that: “Dr. Vogel was unable to name another neurosurgeon who performs neurotomies.” Transit Management asserts that Dr. Schumacher did not find a herniated disc.
The record shows that Dr. Vogel first saw Ms. Sneed on June 29, 1999. Dr. Vogel’s letter of June 29, 1999 listed the following under the heading, “IMPRESSION”:
1. Acute cervical strain versus herniated cervical disc.
2. Acute lumbosacral strain versus herniated lumbar disc.
Dr. Vogel’s letter of August 30, 1999 reported the following under “IMPRESSION”:
*261 1. Herniated lumbar disc with lumbar instability.
2. Chronic cervical strain versus cervical instability.
In his letter dated October 12, 1999, under “IMPRESSION,” Dr. Vogel provided:
1. Herniated lumbar disc.
2. Post-operative bilateral knee surgery status.”
Thereafter, in his report dated December 6, 1999, Dr. Schumacher noted in her family history that Ms. Sneed was widowed and had five children. Dr. Schu-macher stated that:. “The cervical study is normal. There is no evidence of ruptured or herniated disc.” This report was dated after Dr. Vogel found a|nherniated disc on October 12, 1999, when he recommended the patient’s admission for a microsurgical disc excision.
In his letter of January 7, 2000, Dr. Vogel concluded:
... I have reviewed the report of Dr. Schumacher. I agree with Dr. Schu-macher that there .is no extravasation of dye into the spinal canal. However, I have viewed the diseogram/CAT scan of 9/23/99 and concur with the radiologist that there is contrast extending into the left posterolateral epidural space. This is consistent with the Modic Ha herniar tion at this level. It continues to be my impression that this patient is a surgical candidate for microsurgical discectomy at L3^4 on the left.
In his deposition, Dr. Vogel stated that Ms. Sneed suffered a herniated disc at one level and an annular tear at another level as a result of the May 2, 1999 accident. He found that Ms. Sneed had chronic cervical strain or a segmental cervical instability. He recommended the IDET surgery and neurotomy.
On February 22, 2000, Ms. Sneed was given an epidural block for pain before the IDET surgery was approved. The fact that Ms. Sneed underwent the epidural block procedure, indicates that the claimant was experiencing considerable pain.
Dr. Vogel treated Ms. Sneed conservatively for an extended period of time before performing the IDET procedure on April 10, 2000. In the IDET or intradiscal electrothermal annuloplasty surgery procedure, an electrode was threaded into the disc’s annulus and the disc was heated to 90 degrees for about 15 minutes to repair the disc’s annular tear at the L5-S1 level. Dr. Vogel explained that nerve endings that had grown into the disc caused pain. Dr. Vogel noted that the procedure could be performed by any neurosurgeon or orthopedist. He went to Stanford for training in a weekend course in 1997.
|12Pr. Vogel reviewed the neurotomy procedure that was done on April 25, 2001. It included heating the nerves in the L2 through 5 levels on both sides. The herniation was at the L3-4 level. Dr. Vogel cauterized the nerves to resolve the pain. He stated that the neurotomy procedure destroys the nerve endings in the facet region 90 percent of the time.
Dr. Vogel’s curriculum vitae (“CV”) showed that he had been a neurosurgeon for 30 years. Dr. Vogel provided a “Spine” medical journal, in which appeared an article entitled “Management of Chronic Discogenic Low Back Pain with a Thermal Intradisc Catheter.” Dr. Vogel noted that this article stated that the IDET procedure is a satisfactory method for treating annular tears. Dr. Vogel provided another “Spine” article by Dr. Maarten Van Kleef, entitled “Randomized Trial of Ra-diofrequency Lumbar Facet Denervation for Chronic Low Back Pain.” Dr. Vogel testified that the article stated that the neurotomy procedure is a satisfactory *262 method for treating segmental lumbar instability.
According to Dr. Vogel’s testimony, he strongly recommended the procedures, provided Transit Management with all relevant medical reports, and was denied authority to perform the neurotomy at least three times. Dr. Vogel verified that the medical bills were directly related to the May 2, 1999 accident and were reasonable.
The parties may obtain a third doctor’s opinion where there is disagreement under La. R.S. 23:1123. La. R.S. 23:1123 provides:
§ 1123. Disputes as to physical condition of employee; examination under supervision of the director
If any dispute arises as to the condition of the employee, the director, upon application of any party, shall order an examination of the employee to be made by a medical practitioner selected and appointed by the director. The medical examiner shall report his | ^conclusions from the examination to the director and to the parties and such report shall be prima facie evidence of the facts therein stated in any subsequent proceedings under this Chapter.
In the present case, Ms. Sneed submitted to an independent medical examination (IME) by Dr. Carlos R. Gorbitz for the OWC, as well as examinations by Dr. Vo-gel and Dr. Schumacher.
In his report dated February 8, 2000, Dr. Gorbitz stated:
In my opinion this patient has a normal neurological examination. There is only radiological evidence of mild degenerative disc disease at the L3-4 disc, which is anteriorly located with a tear. This has absolutely no clinical significance. There is no encroachment upon the spinal canal and/or nerve roots at the cords. Therefore there is absolutely no need for any surgical intervention on this patient. I will strongly suggest that this patient be engaged in a functional capacity evaluation and asked to return to work. The degree of the patient’s supposed disability and the amount of significant pain, is not compatible with the radiological findings and/or with the clinical evaluation.
In his letter dated March 22, 2000, Dr. Gorbitz related that he was not familiar with the intradiscal electrothermal therapy that Dr. Vogel recommended. Dr. Gorbitz found that the procedure “has no effect on the stability of the spine and no effect on the rest of the pathology either mechanical and/or functional. Therefore, the success rate on this procedure to people such as Ms. Sneed ... is quite questionable.” Dr. Gorbitz noted: “If Dr. Vogel insists on carrying out this procedure I will strongly suggest that a different surgeon evaluate the patient. I would strongly recommend she see Dr. Mitchel Harris, a spinal orthopedic surgeon, and/or Dr. Carlos Pisarello, or Dr. Edward Connolly from Ochsner Foundation.”
| uThe accident occurred on May 2, 1999. Ms. Sneed had pain severe enough to undergo an epidural block procedure on February 22, 2000. Almost two years after the accident, Dr. Vogel performed Ms. Sneed’s neurotomy on April 25, 2001. Dr. Vogel treated Ms. Sneed conservatively for quite some time. It does not appear that Dr. Vogel was rushing to have the patient undergo unnecessary surgery, but he intended to attempt to alleviate her back pain.
In both Gros, supra, and Barron, supra, the compensability of the claimant’s work related injury was generally admitted but authorization for a specific medical procedure was denied. The Fifth Circuit held that the refusal to authorize medical treatment constituted a denial of compensabili *263 ty under R.S. 23:1142 E, thereby providing an exception to Section B which otherwise requires authorization' for medical treatment by the employer or the compensation insurer.
In the present case, the second appointment with Dr. Schumacher was necessary because the first appointment was over a year before, and Ms. Sneed’s condition had changed because she had undergone the first IDET procedure since the time that she initially saw Dr. Schumacher. Regardless of whether or not Dr. Schumacher would have changed his opinion, he should have had the opportunity to examine her under La. R.S. 23:1142 B.
On the other hand, neither Transit Management nor Ms. Sneed requested a review of another independent physician as recommended by Dr. Gorbitz. Ms. Sneed testified that she did not know about the second appointment with Dr. Schumacher. Ms. Sneed’s attorney did not cancel Ms. Sneed’s second appointment with Dr. Schumacher, without explaining his reasoning and giving the defendants notice.
|1sThe record provides a reasonable factual basis to support the finding that the neurotomy surgery was medically necessary, and Ms. Sneed is entitled to the expenses incurred. The record contains copies of the medical expenses as follows:
Memorial Medical Center
4/25/01 $ 16,562.00
Dr. K.E. Vogel
5/01/01 (For 4/25/01) 6,995.00
Anesthesia Consultants Of the South
5/31/01 (For 4/25/01) 900.00
Dr. Nicholas Angelica
Pre-Op 4/23/01 350.00
Total: $ 24,807.00
The claimant, Ms. Patricia Sneed, is awarded the total of $24,807 for the medical expenses incurred for the neurotomy surgical procedure.

Sanctions and Attorney’s Fees

Under the totality of circumstances, we cannot find that the employer was arbitrary and capricious or that the claimant was entitled to sanctions and attorney’s fees for the trial court proceedings where Mrs. Sneed did not keep the second appointment with Dr. Schumacher in violation of La. R.S. 23:1121.
The claimant, Ms. Sneed, answered the appeal and requests additional attorney’s fees for the appeal under La. R.S. 23:632. Therefore, her request can be reviewed. See La. C.C.P. art. 2133; Saacks v. Mohawk Carpet Corp., 2003-0386 (La.App. 4 Cir. 8/20/03), 855 So.2d 359, writ denied, 2003-2632 (La.12/12/03), 860 So.2d 1158. However, Ms. Sneed is not entitled to attorney’s fees for the trial court proceedings, and we cannot find that Ms. Sneed is entitled to attorney’s fees on appeal.
| ^Accordingly, we affirm the workers’ compensation judgment in favor of Transit Management with respect to the medical bills incurred before the neurotomy. The awards of penalties and attorney’s fees with respect to the neurotomy surgery are reversed. The claimant’s request for attorney’s fees for the appeal is denied. The judgment is amended to award Ms. Sneed medical expenses in connection with the neurotomy surgical procedure in the amount of $24,897.00.

AFFIRMED IN PART; REVERSED IN PART; AND AMENDED.